UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COWICHE GROWERS, INC.,<br><br>              Plaintiff,<br><br>   v.<br><br>CONTINENTAL CASUALTY CO.,<br><br>              Defendant. | NO: CV-09-3093-RMP<br><br>ORDER ON CROSS-MOTIONS<br>FOR SUMMARY JUDGMENT |

Before the Court are the Plaintiff's (Ct. Rec. 10) and Defendant's (Ct. Rec. 21) cross-motions for summary judgment. This is an insurance coverage dispute between Cowiche Growers, Inc. ("Cowiche"), an agricultural cooperative that stores and packs its members' apples for sale, and Continental Casualty Co. ("Continental"), an insurance company, which denied coverage for approximately $127,217 in damages experienced by Cowiche in January 2009.

The main issue in the parties' cross-motions for summary judgment is whether the "breakdown" coverage in Cowiche's "boiler and machinery" insurance policy covered the damages Cowiche experienced when ammonia escaped from its

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 1

refrigeration system and ruined boxes of apples being stored in Cowiche's refrigerated rooms.

The Court has heard argument on these issues, reviewed the parties' submissions and the remaining record in this case, and is now fully informed.

## FACTUAL BACKGROUND

Cowiche is an agricultural cooperative whose members are apple orchard owners.  At the time of harvest, the members bring their apples to Cowiche's facility for storage, packing, and sale.  Some of the apples that Cowiche receives are stored in a "regular atmosphere" room that is refrigerated to a temperature just above freezing.  Other apples are stored in a "controlled atmosphere" room that is refrigerated to a temperature just above freezing and manipulated to reduce the amount of oxygen and increase the amount of carbon dioxide in the room to slow down the apples' maturation process.  Both types of storage rooms are refrigerated by an ammonia-based cooling system that requires pressurized ammonia to be moved through the facility's piping system.

On the morning of January 2, 2009, Cowiche's refrigeration manager Sam Glanzer replaced an older malfunctioning liquid solenoid valve, which controls the flow of ammonia in the piping system, with a new liquid solenoid valve.  By all indications, Mr. Glanzer adhered to company protocol in changing the valve.  He

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 2

closed the various valves supplying ammonia to the area of piping around the solenoid valve and allowed the system to drain the ammonia out of the pipes before turning the power off for the relevant area of the refrigeration system. In the process of installing the replacement valve, Mr. Glanzer inserted two gaskets into the new valve at the connections where the refrigerant piping met openings in the valve. Although Mr. Glanzer had an opportunity to inspect the gaskets, there is no indication that he inspected the gaskets for defects at the time of installation.

Mr. Glanzer completed installation, checked his work, and checked for ammonia leaks. He then went to an engine room approximately 1000 feet away from the room where he installed the valve to restore power to the refrigeration system. He was in the engine room for at least five minutes. When Mr. Glanzer returned to the room where he had replaced the valve, he smelled ammonia. He shut down the refrigeration system and called the fire department and for other assistance. The room in which the ammonia leaked contained 1697 units of Braeburn apples and 8044 units of Fuji apples at the time. The ammonia damaged many of the apples in the room rendering them unmarketable for retail. Cowiche later sold the damaged fruit at salvage prices.

After the room was vented, Mr. Glanzer returned to inspect the solenoid valve and surrounding area. By visually examining the piping, but not performing

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 3

any diagnostic tests or other procedures, Mr. Glanzer determined that the leak was occurring from the area of one of the gaskets. He removed the paper gasket by chipping away at it with a screwdriver and removing it in pieces. He then replaced the gasket and reassembled the valve. After restoring electricity to the system for a second time that day, there was no further ammonia leak. Deposition of Sam Glanzer, June 30, 2010 (Ct. Rec. 20-1).

Cowiche submitted a claim to Continental for the damage to the stored apples for reimbursement under Cowiche's boiler and machinery policy with Continental. Continental sent a Risk Control Specialist to investigate, and, after the specialist reported that there was no breakdown within the meaning of the policy, Continental denied the claim (Ct. Rec. 13-3 at 18).

The policy with Continental, in relevant part, offers coverage under the "Equipment Breakdown Protection Coverage Form" for "a 'Breakdown' to 'Covered Equipment'" (Ct. Rec. 20-6 at 72) (Section A, "Coverage"). A "breakdown" to "covered equipment" is the *only* covered cause of loss under that form of the policy (Ct. Rec. 20-6 at 72). If caused by a covered cause of loss, "direct damage to 'Covered Property' located at the premises described in the Declarations" is covered by the policy (Ct. Rec. 20-6 at 72).

Under Section F of that form, "Definitions," the term "Breakdown" is defined as follows in Paragraph 1:

  a. Means sudden and accidental direct physical loss to 'Covered Equipment,' which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within this Coverage Form.
  b. Does not mean or include:
      (1) Malfunction including but not limited to adjustment, alignment, calibration, cleaning, or modification; . . .
      . . .
      (3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection.

(Ct. Rec. 20-6 at 73).

The term "Covered Equipment" is in turn defined as follows in Paragraph 6 of Section F:

  a. Means and includes any:
      (1) Equipment built to operate under internal pressure or vacuum other than weight of contents;
      (2) Electrical or mechanical equipment that is used in the generation, transmission or utilization of energy;
      . . .

(Ct. Rec. 20-6 at 73).

However, by the time of the ammonia leak at Cowiche's facility, Continental had issued an "endorsement" ("the Endorsement") that "modifies insurance provided under the . . . Equipment Breakdown Protection Coverage Form" (Ct.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 5

Rec. 20-6 at 76).[1]  The Endorsement replaces two separate paragraphs of the Equipment Breakdown Protection Coverage Form and provides in relevant part:

> A. Paragraph 12 of Section B. Exclusions, is deleted in its entirety and replaced by the following:
> 12. . . .
> B. Paragraph 1. 'Breakdown' of Section F. Definitions, is deleted in its entirety and replaced by the following:
> 1. 'Breakdown':
>    a. Means sudden and accidental direct physical loss to 'Covered Equipment,' which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within this Coverage Form.
>    b. Does not mean or include:
>       (1) Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;
>       . . .
>       (3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection.
>       . . .

(Ct. Rec. 20-6 at 76) (boldface removed).

After Continental denied the claim, Cowiche sued Continental in Yakima County Superior Court for a declaratory judgment finding that Continental breached its obligations under the insurance policy, denied the coverage claim in bad faith, and violated the Consumer Protection Act. Cowiche also seeks treble damages under the Insurance Fair Conduct Act ("IFCA"), Chapter 48.30 RCW, for

---

[1] A comparison of the definitions language in the initial policy and the Endorsement is included in Appendix A.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 6

unreasonable denial of a claim for coverage by an insurer. Continental removed the suit to federal court.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. As such, the Court will apply Washington state substantive law and federal procedural law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938).

## ANALYSIS

*Motion to Strike*

As a preliminary matter, the Court notes that Plaintiff, in its memorandum in opposition to the Defendant's summary judgment motion, moves to strike "Section II of Defendant's Memorandum since it seeks to discuss and apply an unpublished decision" (Ct. Rec. 26 at 1). The Plaintiff objects to the Defendant's citation of an unpublished opinion filed before January 1, 2007, in violation of LR 7.1(g)(2). The Court will not consider the opinion as authority in rendering its decision.

*Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A key purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).  Summary judgment is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Celotex*, 477 U.S. at 327.

     Summary judgment is inappropriate where sufficient evidence supports the claimed factual dispute or where different ultimate inferences may reasonably be drawn from the undisputed facts.  *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  The moving party must demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp.*, 477 U.S. at 325.  The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  The evidence supporting summary judgment must be admissible.  Fed. R. Civ. P. 56(e).  Furthermore, the court will not presume missing facts, and non-specific facts in affidavits are not sufficient to support or undermine a claim.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S.Ct. 3177 (1990).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 8

*Canons of construction applicable to insurance policies*

Interpretation of an insurance policy is a question of law for the court. *PUD No. 1 v. International Ins. Co.*, 124 Wn.2d 789, 797 (1994). An insured contesting the denial of coverage must first show that the loss falls within the scope of the policy's covered losses. *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 97 Wn. App. 335, 337 (1999). The insurer then must show that the claim of loss is excluded. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 71 (1994).

Under Washington law, courts strictly construe an ambiguous exclusionary clause against the insurer. *Rodriguez v. Williams*, 107 Wn.2d 381, 384 (1986); *Kish v. Ins. Co. of N. Am.*, 125 Wn.2d 164, 170-71 (1994). A provision of the policy is ambiguous if "'it is fairly susceptible to two different interpretations, both of which are reasonable.'" *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 123 Wn.2d 678, 690, 871 P.2d 146 (1994) (quoting *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733 (1992)). The issue of ambiguity is a question of law. *Kaplan v. Northwestern Mt. Life Ins. Co.*, 115 Wn. App. 791, 800 (2003).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 9

*Undisputed facts*

The Plaintiff does not dispute that the only damage that occurred in the ammonia leak was to the fruit and to the gasket. The claim submitted to Continental was for the damaged fruit only.

Defendant emphasizes in particular the deposition testimony of Cowiche employee and spokesperson Thomas ("Mike") Sliman, Jr.:

> Q. This letter refers only to the fruit itself that was exposed to the ammonia fumes. Is there any other claim for property damage that's being made here against Continental Casualty?
> A. Property, i.e., stock or are you talking about physical property?
> Q. Physical property.
> A. No, there is not.
> Q. To your knowledge, was there any other damage to physical property other than the damage to the fruit?
> A. Correct, there is no other physical damage that I'm aware of or that we have claimed in conjunction with this.

Dep. of Thomas ("Mike") Sliman, Jr., June 30, 2010 (Ct. Rec. 20-4 at 43-44).

Defendant claims that the only broken piece of equipment was the gasket and that the gasket broke as a result of Mr. Glanzer, Cowiche's refrigeration manager, "brittling" the gasket out and breaking it into pieces in the process of removal. Defendant cites Mr. Glanzer's deposition testimony, which states:

> [After the room with the ammonia leak was safe to enter again, and Mr. Glanzer inspected the solenoid valve …]
> Q. . . . All right, so did you pull the valve off entirely and hold it in your hand and –

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 10

> A. I did.
> Q. And when you pulled the valve off and held it in your hand, could you see the gasket?
> A. I could see the gasket.
> Q. And did you see any damage to the gasket?
> A. I didn't see any damage, but I was also wearing a mask. I was going to get the gasket out and put a new gasket in and put it back together.
> Q. And did you do that at that point?
> A. At that point I did.
> Q. Were you still wearing a mask when you performed that?
> A. I did.
> Q. And you told us that you used a screwdriver. Did you – did you first try to, like, just put your finger in there and pull it out or tap the solenoid against the solid surface to see if it was loose?
> A. I kind of brittled it out. I held it and just kind of went around, and wherever the – I think I picked them up the next day and they fell on the ground, and I put the new gasket in and put it together.
> Q. To the best of your knowledge, the gasket itself was not – you have no information that it was actually damaged except by the fact that you took a screwdriver and kind of, as you call it, brittled it out, kind of shearing off little sections and pulling them out of the valve?
> (A discussion was held off the record.) (The court read back the requested portion of the proceeding, beginning at Page 59 Line 13.)
> A. Yes.
> Q. And as you brittled it out, the pieces of the gasket – some of which we have here; we don't know that this is the entire gasket – nobody's –
> Correct?
> A. Correct.
> Q. And then did you put a new gasket – pull a new gasket out of your – the bag of gaskets that you had for the solenoid valves and install a new gasket?
> A. Yes, I did.
> Q. All right. And then did you reassemble the solenoid using the same valve that – where the leak had occurred?
> . . .

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 11

> Q. Aside from the gasket itself, then, the only piece that was removed from the arrangement that we see here in the photograph was the gasket itself; correct?
> A. Correct.

(Ct. Rec. 20-1 at 15-18)

Plaintiff agrees that the source of the ammonia leak was at the point in the connection between the solenoid valve and the piping where the gasket was supposed to seal the solenoid valve. (Ct. Rec. 25 at 4). Plaintiff also agrees that once the gasket was replaced, there was no further ammonia leak. *Id.* The only dispute is as to whether the gasket failed in a way, prior to Mr. Glanzer's "brittling" it out with a screwdriver, that would qualify the gasket and or the refrigeration system as a whole as "failed equipment" for coverage under the Equipment Breakdown Protection Coverage Form of the boiler and machinery policy. Regarding this disputed question of fact, Cowiche proposes that "[w]e do not know why, nor will we ever know why [the gasket failed in this case]." (Ct. Rec. 26 at 7). The issue is, then, immaterial for purposes of deciding this case on a summary judgment motion.

*Application of the relevant language of insurance policy to the undisputed facts*

In its summary judgment motion, Plaintiff cited to the language in the Equipment Breakdown Protection Form of the insurance policy (Ct. Rec. 13-2 at 14-15). In its initial brief, Plaintiff relied on the definitions contained in that

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 12

document. Defendant responded that an Endorsement with revised definitions supersedes the Equipment Breakdown Protection Form on which Plaintiff relies (Ct. Rec. 20-6 at 76). Defendant argues that that Plaintiff was properly denied coverage, with application of the definitions in the Endorsement and the remainder of the policy, because Plaintiff suffered no physical damage to covered equipment, only to the apples which Defendant contends do not constitute "covered equipment" under the Endorsement's revised definitions. Plaintiff does not refute this, and the Court finds that the apples do not fit the definition of "covered equipment" under the policy because they are not "built to operate under internal pressure or vacuum" or "used in the generation, transmission or utilization of energy" (Ct. Rec. 20-6 at 73).

Cowiche does not dispute that it received the Endorsement. Therefore, the only issue regarding the significance of the Endorsement is an issue of law rather than fact: whether the original or the revised definition of "breakdown" should apply as a matter of law.

<u>Applicable definition of "breakdown"</u>

Plaintiff contends that the revised definition of "breakdown" in the Endorsement is ambiguous because it could be interpreted to mean either that: (1) the revised definition applies only to Exclusion 12 in the Endorsement; or that (2)

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 13

the revised definition applies to the whole insurance contract. Cowiche contends that a reasonable insured could read the Endorsement to intend the new definition of "breakdown" in the Endorsement to apply only to the single exclusion that was also revised by the Endorsement. Defendant contends that there is no ambiguity, because the only definition of "breakdown" in the entire policy is in the Endorsement.

The Court finds no ambiguity as to whether the redefinition of "breakdown" in the Endorsement applies solely to the exclusion that happens to be redefined on the same page of the Endorsement or, instead, to the Equipment Breakdown Protection Form as a whole. At the top of the Endorsement in all caps and in large font, the following statement appears: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY" (Ct. Rec. 20-6 at 76). Another statement appears at the top of the Endorsement: "This endorsement modifies insurance provided under the following: EQUIPMENT BREAKDOWN PROTECTION COVERAGE FORM" (Ct. Rec. 20-6 at 76). In addition, the Endorsement states that "Paragraph 1. 'Breakdown' of Section F. Definitions is deleted in its entirety and replaced by the following [revised definition]." (Ct. Rec. 20-6 at 76). By its plain language, the "breakdown" definition of the Endorsement applies to the Equipment Breakdown Protection Form as a whole and is the operative definition for purposes of this dispute. *See Kaplan*, 115 Wn. App. 791,

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 14

800 (2003); *PUD No. 1*, 124 Wn.2d at 797 (interpretation of insurance contract terms and determination of whether ambiguity exists are questions of law for the court).

*Application of the Equipment Breakdown Protection Coverage Form as a Whole to the Undisputed Facts*

The relevant part of the boiler and machinery policy covers property damage caused by "a 'Breakdown' to 'Covered Equipment.'" (Ct. Rec. 20-6 at 76). The next step in the Court's inquiry is to apply the revised definition of "breakdown" to the policy language governing "covered equipment." The Endorsement states that a qualifying "breakdown" occurs when there is a "sudden and accidental direct physical loss to 'Covered Equipment,' which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within [the Equipment Breakdown Protection Coverage Form]." (Ct. Rec. 20-6 at 76). A qualifying "breakdown" does not occur when there is a "malfunction, including but not limited to adjustment, alignment, calibration, cleaning or modification" or "leakage at any valve, fitting, shaft seal, gland packing, joint or connection," among other exclusions. (Ct. Rec. 20-6 at 76).

Even if the Court were to assume that Cowiche could show that the gasket was damaged through "sudden and accidental direct physical loss . . . which

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 15

manifests itself by physical damage necessitating its repair or replacement," Continental has shown that coverage is precluded here by the unambiguous exclusions in the definition of "breakdown," namely, malfunctions and leakage at any valve, joint, or connection (Ct. Rec. 20-6 at 76); *see Queen City Farms*, 126 Wn.2d at 71 (after insured shows that a loss is covered, insurer bears burden of showing that a loss is excluded). The undisputed facts show that the leak occurred at the point of connection between the solenoid valve and the refrigerant piping. (Ct. Rec. 13 at 6) (Plaintiff's statement of specific facts); (Ct. Rec. 23 at 3) (Defendant's statement of undisputed facts).

Cowiche's refrigeration mechanic saw no damage to the gasket before breaking it up to remove it and replace it, and once the gasket was replaced there was no further ammonia leakage. These facts fall solidly within the plain language of the following two exclusions: "malfunction, including but not limited to adjustment, alignment, calibration, cleaning or modification" or "leakage at any valve, fitting, shaft seal, gland packing, joint or connection." (Ct. Rec. 20-6 at 76).

The Court concludes that Continental did not wrongfully or unreasonably deny coverage for the damage suffered by Cowiche. Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment. Given that Cowiche's remaining claims require a

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 16

showing that Continental wrongfully or unreasonably denied coverage, those claims also are appropriately dismissed. Accordingly,

**IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Summary Judgment (**Ct. Rec. 10**) is **DENIED.**

2. Defendants' Motion for Summary Judgment (**Ct. Rec. 21**) is **GRANTED**.

3. All pending motions, if any, are **DENIED AS MOOT**.

4. All pending deadlines and hearing dates, if any, are hereby **STRICKEN**.

The District Court Executive is directed to enter this Order, enter judgment against Plaintiff and in favor of Defendant, forward copies to counsel, and close the file.

**DATED** this 25th of October, 2010.

> *s/ Rosanna Malouf Peterson*
> ROSANNA MALOUF PETERSON
> United States District Court Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT – 17